UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:26-CV-0094-GNS

COMFORT SYSTEMS USA (KENTUCKY), INC. PLAINTIFF

v.

AHM BOWLING GREEN LLC
d/b/a ALL HOURS MECHANICAL et al. DEFENDANTS

# **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (DN 5) and Plaintiff's Motion for Leave to File Excess Pages (DN 26). The motions are ripe for adjudication.

## **I. STATEMENT OF FACTS AND CLAIMS**

Plaintiff Comfort Systems USA (Kentucky), Inc. ("Comfort KY"), initiated this action after three former employees began working for a competitor, Defendant AHM Bowling Green LLC d/b/a All Hours Mechanical ("AHM"). (*See* Compl., DN 1). Comfort KY, a subsidiary of Comfort Systems USA, Inc. ("Comfort USA"), provides commercial heating, ventilation, air conditioning ("HVAC"), and refrigeration services, as well as mechanical, electrical, piping, construction, and building automation controls services. (Compl. ¶ 12). Greg Robinson ("Robinson") is Comfort KY's president. (Prelim. Inj. Hr'g; Defs.' Suppl. Br. Ex. A, at 28:2-4, DN 39-1 [hereinafter Unofficial Tr.]).

Comfort KY hired Defendant Darren Young ("Young") as Executive Vice President of its Bowling Green Division after Comfort KY acquired his father's company, Young's Mechanical, Inc., in 2019. (Young Decl. ¶ 7, DN 27-4). As a condition of the acquisition and

his employment, Young was required to sign an employment agreement containing restrictive covenants. (Young Decl. ¶ 9; Prelim. Inj. Hr'g Pl.'s Ex. 5, at 3-7 [hereinafter Young Agreement]). The agreement provides, in relevant part:

> 3. Confidentiality.
>
> (a) *Confidential Information*. As used herein, the term "Confidential Information" means any information, technical data or know-how of the Company and the other members of the Comfort Group, including, but not limited to, that which relates to customers, business affairs, business plans, . . . operational and hiring matters, contracts and agreements, marketing, sales and pricing, prospects of the Comfort Group . . . . [Young] hereby acknowledges that during the term of [his] employment contemplated herein, [he] will come into contact with, and have access to the above described Confidential Information.
>
> (b) *No Disclosure*. Except in the performance of [Young]'s duties as an executive of the Company, [he] will not, during or after the term of [his] engagement with the Company, disclose to any person or entity or use, for any reason whatsoever, any Confidential Information.
>
> 4. Non-Competition Agreement.
>
> (a) *Non-Competition*. As a material condition of the Transaction and [Young]'s employment with the Company, [Young] agrees to the following reasonable restrictive covenants. . . . For the **Time Period** set forth in paragraph (i) below, [Young], on behalf of [Young] or on behalf of or in conjunction with any other person, company, partnership, corporation or business of whatever nature, shall not directly or indirectly own, manage, operate, participate in or finance any business venture that competes with the Comfort Group within the **Area** set forth in paragraph 4(a)(ii).
>
> > (i) **Time Period** for the purposes of paragraph 4(a) shall mean the period beginning as of the date of the execution of this Agreement and shall end two (2) years after the date of [Young]'s employment with the Company terminates.
> >
> > (ii) **Area** for the purposes of paragraph 4(a) shall mean within two hundred (200) miles of where the Company conducts business.
>
> (b) *Non-Solicitation / Non-Raiding*. . . . During the term of [Young]'s engagement with the Company and for a period of two (2) years immediately following termination of [Young]'s employment, for any reason whatsoever, [Young] on behalf of [himself] or on behalf of or in conjunction with any other

> person, company, partnership, corporation or business of whatever nature, shall not directly or indirectly hire any person who is or has been a sales, technical or managerial employee of the Company during the one-year period prior to the date of such hire, nor shall [Young] contact any person who is or has been a sales, technical or managerial employee of the Company during the one-year period prior to the date of such hire, nor shall [Young] contact any person who is, at that time, an employee of the Company, or any other member of the Comfort Group, for the purpose or with the intent of enticing such employee away from or out of the employ of the Company or the Comfort Group.
>
> (c) *Non-Piracy / Non-Raiding*. . . . During the term of [Young]'s engagement with the Company and for a period of two (2) years immediately following termination of [Young]'s employment, for any reason whatsoever, [Young], on behalf of [himself] or on behalf of or in conjunction with any other person, company, partnership, corporation or business of whatever nature, shall not directly or indirectly call upon any person or entity which is that time, or which has been within two (2) years prior to that time, a customer of the Company for the purpose of soliciting or selling Services.
>
> . . .
>
> (e) *Restraint is Reasonable*. [Young] and the Company hereto agree that the time durations and geographic areas for which the covenants in this Section 4 are to be effective are reasonable. [Young] recognizes and acknowledges that the provisions of these restrictive covenants, which are contained in this Section 4, were conditions precedent for [his] employment with the Company in an executive position. [Young] acknowledges and agrees that the foregoing restrictive covenants (i) are necessary to protect the value of the good will acquired by the Company as part of the Transaction and that the restrictive covenants impose restrictions no greater than necessary to protect the value of the good will, and (ii) are necessary to protect the trade secrets of Comfort.

(Young Agreement 3-5). Young signed a draft copy of the agreement but never received a fully executed copy. (Young Decl. ¶ 11). He provided this draft copy to Comfort KY after it apparently could not locate a copy. (Young Decl. ¶ 11).

Defendant Matthew Martin ("Martin") worked for Young's Mechanical and became a Comfort KY employee when the company was sold. (Martin Decl. ¶¶ 1-2, DN 27-5). When he was promoted by Comfort KY from service technician to a sales representative in 2020, he was required to sign an employment agreement, which contains different restrictive covenants than

Young's. (Martin Decl. ¶ 3; *compare* Young Agreement, *with* Prelim. Inj. Hr'g Pl.'s Ex. 24, at 2-4 [hereinafter Martin Agreement]). It provides, in relevant part:

> **11) <u>NONDISCLOSURE</u>**
>
> [Martin] agrees at all time to hold as secret and confidential any and all knowledge, technical information, business information, developments, trade secrets, know-how and confidences of Comfort Systems USA ("the Company") and of any third party who has entrusted its own such information to the Company, including but not limited to, the following:
>
> (a) any formula, pattern, device, plan, drawing, technical information, blueprint, data, diagram, model, specification, computer program, process or compilation of same which is, or is designed to be, used in the business of the Company or results from its activities;
>
> (b) all business plans and/or strategies, financial information, customer and sales information, price lists, vendor information, cost information, and personnel information;
>
> . . .
>
> (collectively, "Confidential Information"). [Martin] agrees not to use this Confidential Information for his/her own benefit or for the benefit of others (except as Company duties may require) either during or after employment with the Company without prior written consent from the Company. Further, [Martin] agrees not to remove or aid in the removal from the premises of the Company such Confidential Information or any property or material which relates thereto.
>
> . . .
>
> Upon [Martin]'s separation from employment with the Company, [Martin] agrees to return and deliver to the Company all notes, notebooks, drawings, blueprints, customer and sales information, and all other Confidential Information, together with copies, compilations, and summaries of same, which are in his/her possession or under his/her control.
>
> **12) <u>NONCOMPETITION</u>**
>
> [Martin] agrees that during the 18 month period commencing on the date of his separation from the Company's employ (the "Noncompetition Period"), he will not, without the prior written consent of the Company, either directly or indirectly, in the geographical area in which the

> Company maintains offices, sales agents, or otherwise conducts business, solicit business from, or compete with the Company for the business of any customer of the Company on his/her own behalf or on behalf of any person, business, or entity which is or may be in competition with or engaged in the same or similar conduct, activities, or business as the Company, involving, but not exclusively limited to HVAC service & maintenance, building automation systems, controls, security, digital video and card access. A customer is defined as a client who Comfort Systems USA has done business with or has had in the past two years including service agreements, repairs, replacement or whose primary building automation or security system was installed by Comfort Systems USA or one of the companies it has acquired. General contractors are excluded from this customer list.
>
> **13) <u>NONSOLICITATION/NONINTERFERENCE</u>**
>
> [Martin] further agrees that during this eighteen month period, he will not at any time, without the prior written consent of the Company, directly or indirectly solicit or induce, attempt to solicit or induce, or aid or assist in the solicitation or inducement of any employee, agent, other representative or associate of the Company, vendor and/or supplier to terminate his, her or its relationship with the Company.

(Martin Agreement 2-4). Martin never received a copy of the agreement. (Martin Decl. ¶ 5).

Defendant Sean Ramsey ("Ramsey") also began working for Comfort KY in 2019, first as a pipe welder, then as a piping estimator. (Ramsey Decl.¶ 2, DN 27-6; Ramsey Dep. Excerpts 23:17-19, July 15, 2026, DN 36-9). He did not sign any employment agreement with restrictive covenants. (Ramsey Decl. ¶ 2).

Young, Martin, and Ramsey all resigned from Comfort KY in the span of a few weeks in January or February 2026. (Young Decl. ¶ 18; Martin Decl. ¶ 15; Ramsey Decl. ¶ 14). All three were hired by AHM, a small HVAC company that services the Bowling Green region. (Young Decl. ¶ 48; Martin Decl. ¶ 14; Ramsey Decl. ¶ 9; Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. Ex. 2, ¶¶ 1, 4-6, DN 27-2).

On May 22, 2026, Comfort KY filed the Complaint against AHM, Young, Martin, and Ramsey ("Defendants") for misappropriation of trade secrets, breach of the employment

agreements, tortious interference with the employment agreements and Comfort KY's business advantage, breach of fiduciary duty and the duty of loyalty, conversion, trespass to chattel, promissory estoppel, fraudulent and negligent misrepresentation, and equitable estoppel. (Compl. ¶¶ 79-173). That same day, Comfort KY moved for a temporary restraining order ("TRO") and preliminary injunction, as well as expedited discovery. (Pl.'s Mot. TRO & Prelim. Inj., DN 5). On June 3, 2026, this Court granted Comfort KY's motion and entered a TRO against Young, Martin, and AHM, preventing Young and Martin from working with AHM and using Comfort KY's confidential information. (Order, DN 14). This Court held a preliminary injunction hearing on July 24, 2026. At the conclusion of the hearing, the Court terminated the TRO as to Martin and ordered the parties to file supplemental briefs. (Order, DN 38). Comfort KY also moved for leave to file excess pages in its TRO and preliminary injunction motion. (Pl.'s Mot. Leave File Excess Pages, DN 26)

## II. <u>JURISDICTION</u>

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction. *See* 28 U.S.C. § 1331. In addition, the Court has supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(a).

## III. <u>DISCUSSION</u>

### A. <u>Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction</u>

Evaluating a request for the "extraordinary remedy" of a preliminary injunction requires balancing four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 23 (2008) (citations omitted); *Adams v. Fed. Express Corp.*, 547 F.2d 319, 323 (6th Cir. 1976) (citing *N. Avondale Neighborhood Ass'n v. Cincinnati Metro. Hous. Auth.*, 464 F.2d 486, 488 (6th Cir. 1972)); *see also* Fed. R. Civ. P. 65. A court should make specific findings concerning each factor, "unless fewer are dispositive of the issue." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. Sch. Dist. of Ferndale*, 577 F.2d 1339, 1352 (6th Cir. 1978)).

The four preliminary injunction factors are "factors to be balanced, not prerequisites that must be met . . . ." *Michael v. Futhey*, No. 08-3932, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (internal quotation marks omitted) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997)). Nonetheless, the hallmark of injunctive relief is a likelihood of irreparable harm. *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("[T]he demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." (citation omitted)); *see also Winter*, 555 U.S. at 7, 22-23 (citations omitted) (rejecting the notion that a mere "possibility" of irreparable injury was sufficient for a preliminary injunction and holding that "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction").

Plaintiff bears the burden of demonstrating his entitlement to a preliminary injunction, and his burden is a heavy one. "Certainly, 'scant evidence' will not support an injunction." *A.M.C. v. Smith*, 620 F. Supp. 3d 713, 732 (M.D. Tenn. 2022) (quoting *Patel v. AR Grp. Tenn., LLC*, No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020)). Injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette*

*Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th. Cir. 2002) (citation omitted); *see also Winter*, 555 U.S. at 24.

**1. *Irreparable Injury***

"To establish immediate and irreparable harm there must be an actual, viable, presently existing threat of serious harm." *C.A. Jones Mgmt. Grp., LLC v. Scottsdale Indem. Co.*, No. 5:13-CV-00173, 2014 WL 811654, at *4 (W.D. Ky. Feb. 28, 2014) (citation omitted). The threat must be more concrete than "speculative or protentional harm." *Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 514 (6th Cir. 2025). As the Sixth Circuit has noted, "a plaintiff's harm is not irreparable if it is fully compensable by money damages. However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). "Courts have consistently held that a breach of a non-compete clause and loss of goodwill constitute irreparable injury." *First Fin. Bank, Nat'l Ass'n v. Williams*, No. 5:19-CV-128-TBR, 2019 WL 4865888, at *4 (W.D. Ky. Oct. 2, 2019) (citations omitted).

Comfort KY argues that it has established two irreparable harms: (1) the loss of fair competition and (2) the loss of customer relationships and goodwill. (Pl.'s Suppl. Br. 2, DN 40). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer*, 973 F.2d at 512 (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). "Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* (citing *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991)).

Defendants argue that these harms are speculative and compensable by monetary damages. (Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. 42, DN 27; Defs.' Suppl. Br. 5, DN 39). To support this claim, Defendants cite *AWP, Inc. v. Safe Zone Services, LLC*, No. 3:19-CV-00734-CRS, 2022 WL 989133 (W.D. Ky. Mar. 31, 2022), in which this Court stated:

> [I]n an industry where service providers are selected on a job-by-job basis, evidence of being chosen for work in the past establishes nothing about the likelihood of being chosen for such work in the future. AWP has admitted as much by stressing the importance of establishing and maintaining a good rapport with electrical foremen in order to continue being selected for PPL jobs. . . . The reality is, there is simply no way to know how much of this work would have gone to AWP had Safe Zone not hired AWP's workers or had it not been established as a competing business at all.

*Id.* at *6. In *AWP*, however, the Court was considering monetary damages on summary judgment; at the preliminary injunction stage, any difficulty in determining monetary damages supports finding irreparable harm. *See id.*; *BellSouth Telecomms., Inc. v. Cinergy Commc'ns Co.*, No. 3:05-CV-16-JMH, 2005 WL 8163051, at *6 (E.D. Ky. Apr. 22, 2005). Moreover, although Comfort KY may face difficulty in proving Defendants caused any loss of goodwill, Comfort KY does not face the same issue with loss of fair competition, which would be caused by Defendants' violation of non-competition agreements. *See DeHority v. Chamberlain*, No. 2:25-CV-02383-TLP-TMP, 2025 WL 1243073, at *7 (W.D. Tenn. Apr. 29, 2025) (citation omitted) ("[T]he moving party must show that a company's reputation or goodwill will be impaired absent injunctive relief."); *Marathon Equip. Co. v. Quinn*, No. 1:22-CV-205-TAV-SKL, 2022 WL 16542571, at *3 (E.D. Tenn. Oct. 28, 2022) ("[P]laintiff has not provided evidence that defendant's actions have caused plaintiff's customers to cease doing business with plaintiff or that plaintiff has otherwise been harmed in any way." (citation omitted)).

Even though these types of harms are generally considered irreparable, however, "an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable

harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) (citing *Aero Fulfillment Servs., Inc. v. Tartar*, No. C-060071, 2007 WL 120695, at *5 (Ohio Ct. App. Jan. 19, 2007)). "In fact, numerous courts have recognized that any presumption of irreparable injury resulting from a court's finding that the plaintiff can show a substantial likelihood of success on the merits is rebutted by a delay of even a few months in seeking preliminary injunctive relief." *Vita-Mix Corp. v. Tristar Prods., Inc.*, No. 1:07 CV 275, 2008 WL 11383504, at *9 (N.D. Ohio Sep. 30, 2008) (citation omitted); *see also id.* ("Therefore, even if Plaintiff could show a substantial likelihood of success on these claims and a presumption of irreparable harm arises, the court concludes that Plaintiff's eleven-month delay in seeking the extraordinary remedy of injunctive relief undermines its belated assertion of irreparable harm on these claims." (citation omitted)). "[A]bsent a good explanation, a substantial period of delay 'militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.'" *Young v. Lumenis, Inc.*, 301 F. Supp. 2d 765, 772 (S.D. Ohio 2004) (quoting *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)) (delay was justifiable because plaintiff attempted to negotiate then gathered evidence). "It is within the court's discretion to determine whether the delay was unreasonable, and thus weighs against a finding of irreparable harm." *CEI Grp. LLC v. C.E.I. Composite Materials, LLC*, No. 19-11611, 2021 WL 534485, at *4 (E.D. Mich. Feb. 12, 2021) (citing *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019)).

The unreasonableness of delay can also be characterized as a "type of laches argument." *Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, 575 F. Supp. 3d 785, 842 (W.D. Ky. 2021). "Laches is 'principally a question of the inequity of permitting [a] claim to be enforced.'"

*R.K. v. Lee*, 563 F. Supp. 3d 774, 784 (M.D. Tenn. 2021) (quoting *Kehoe v. Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 585 (6th Cir. 2015)). "The doctrine is derived from the principle that 'equity aids the vigilant, not those who slumber on their rights.'" *Id.* (quoting *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941)). Typically, a defendant "asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* (quoting *Kehoe*, 796 F.3d at 584).

In this instance, there is some dispute about when Comfort KY should have known Young and Martin were allegedly violating their employment agreements. Defendants contend that Comfort KY waited around three or four months to file a preliminary injunction. (Defs.' Suppl. Br. 4). Young resigned on January 12, 2026, and Martin and Ramsey resigned on February 20, 2026. After Martin and Ramsey resigned, Robinson testified that he "knew" what was happening. (Prelim. Inj. Hr'g; Unofficial Tr. 133:1-5). By early March, Robinson had seen AHM's social media post featuring Young and Martin posed with others in front of a service van emblazoned with AHM's signage, which reflects that Comfort KY was aware that they both were working for AHM. (Prelim. Inj. Hr'g; Pl.'s Reply Supp. Mot. TRO & Prelim. Inj. 13, DN 36; Compl. Ex. 10, DN 1-10). Comfort KY, however, did not request a preliminary injunction until May 22, 2026. (Pl.'s Mot. TRO & Prelim. Inj.).

Courts have found similar lengths of delays to be reasonable. *York Risk Servs. Grp.*, 787 F. App'x at 309 (in deciding preliminary injunction for violation of a non-compete, a six-month delay was not unreasonable); *Lothamer Tax Resol., Inc. v. Kimmel*, No. 1:25-CV-579, 2025 WL 2490380, at *13 (W.D. Mich. Aug. 29, 2025) (delay of less than three months is not unreasonable). Thus, the length of the delay is not so significant, in and of itself, to rebut a finding of irreparable harm. Comfort KY's reasoning for this delay, however, militates against

the conclusion that this situation constitutes an emergency. Courts have excused delays when the party requesting an injunction was attempting to settle the dispute or needed time to consult with attorneys or investigate its claims. *See Kalmbach Feeds, Inc. v. Purina Animal Nutrition, LLC*, No. 2:25-CV-00617, 2025 WL 3153412, at *13 (S.D. Ohio Nov. 12, 2025) (finding delay justified where diligence was necessary and issues involved were complex). In this instance, the record reflects that Comfort KY made no attempt to address what it now claims as an emergency and did not bother to put Young or Martin on notice of its intention to enforce its rights by way of a cease and desist letter or any other form of communication before filing suit. Although Comfort KY now contends that Young is breaching his non-competition agreement by virtue of his employment with AHM, it waited around two and a half months to take *any* action to assert its rights after Young and Martin's employment began with AHM. (Pl.'s Reply Supp. Mot. TRO & Prelim. Inj. 3).

Robinson confirmed that he had Young and Martin's contact information but did not reach out to them before filing suit because he already reminded them of their non-compete agreements when they resigned. (Prelim. Inj. Hr'g; Unofficial Tr. 134:23-135:14). Robinson said that he "was trying to be patient and see if they were going to back off[,]" which begs the question "back off" for what, given that Robinson made no effort to notify anyone that Comfort KY intended to enforce the non-compete obligations. (Prelim. Inj. Hr'g; Unofficial Tr. 134:16-22). Under the circumstances, it appears that Comfort KY "s[a]t on its hands upon learning of Defendants' alleged infringement." *Hydrojug, Inc. v. Five Below, Inc.*, 625 F. Supp. 3d 684, 715 (N.D. Ohio 2022). Comfort KY sent no cease and desist letter and made no effort at negotiation, but instead allowed a significant and unexplained delay before seeking injunctive relief.

Further, Robinson confirmed that May, when Comfort KY filed this action, is the start of the HVAC industry's busy season. (Prelim. Inj. Hr'g; Unofficial Tr. 134:4-8). An injunction preventing Young and Martin from working with AHM, therefore, would be more harmful to Defendants in May than in March. *Compare Ohio Contractors Ass'n v. City of Akron*, No. 5:14-CV-0923, 2014 WL 1761611, at *8 (N.D. Ohio May 1, 2014) ("[Plaintiff] let at least two months lapse during which it had full knowledge of the local hire quotas and the harm they allegedly would cause [Plaintiff]. [Plaintiff] instead waited until the eve of bidding to seek injunctive relief, compromising defendant's ability to finance the Rack 15 Project. Even if [Plaintiff] had demonstrated irreparable harm, which it has not, its unconscionable delay in bringing this lawsuit diminishes whatever irreparable harm might exist." (footnotes omitted)), *with R.K.*, 563 F. Supp. 3d at 784 ("The Governor has not specifically articulated prejudice beyond conclusory assertions and is in the same position defending against Plaintiffs' request for injunctive relief now as he would have been one month ago." (citation omitted)). Defendants were predictably prejudiced by Comfort KY's delay because AHM lost two of its nine employees as a result of this Court's TRO just as the busy season began. (Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. 48).

In conclusion, though violations of non-competition and nondisclosure agreements are typically considered irreparable harm, Comfort KY has not persuaded the Court that its delay in asserting its rights was reasonable. Because the equitable considerations weigh against Comfort KY, this factor does support the issuance of a preliminary injunction.

**2. *Likelihood of Success***

To establish a likelihood of success on the merits, "a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II*, 119 F.3d at 402 (citation omitted). A plaintiff must "establish[] a substantial likelihood or probability of success on the merits . . . ."

*Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)). Comfort KY seeks injunctive relief for its claims arising from the breach of non-competition provisions and the theft and misuse of its confidential information. (Pl.'s Mot. TRO & Prelim. Inj. 22, 29).

**a. Non-competition Provisions**

Comfort KY brings two types of claims related to non-competition: breach of contract and tortious interference with contract. (Pl.'s Mot. TRO & Prelim. Inj. 22). To make out a claim for breach of contract under Kentucky law, a plaintiff must: "1) establish the existence of a contract, 2) prove a breach of that contract, and 3) show damages flowing from the breach." *House v. Players' Dugout, Inc.*, 440 F. Supp. 3d 673, 682 (W.D. Ky. 2020) (citing *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009)). "A party alleging tortious interference with a contract must show the following six elements: (1) the existence of a contract; (2) the defendant's knowledge of this contract; (3) that the defendant intended to cause its breach of the contract; (4) causation; (5) that the breach at issue caused damages to the plaintiff; and (6) that the defendant had no privilege or justification to excuse its conduct." *Ebonite Int'l, Inc. v. Hickland*, No. 5:17-CV-00080-TBR, 2018 WL 2107779, at *4 (W.D. Ky. May 7, 2018) (internal quotation marks omitted) (quoting *Ventas, Inc. v. Health Care Prop. Invs., Inc.*, 635 F. Supp. 2d 612, 618-19 (W.D. Ky. 2009)).

Thus, Comfort KY must first show that an enforceable contract exists. Defendants argue that Young's contract is not enforceable because it was not fully executed, but "[i]t is not always necessary for both parties to sign a contract, particularly where one has signed and both parties thereafter act as if they had a binding contract." *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 837 (Ky. 2013) (quoting *Cowden Mfg. Co. v. Sys. Equip. Lessors, Inc.*,

608 S.W.2d 58, 61 (Ky. App. 1980)); (Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. 23). Though Young only signed a "draft" copy, Young and Comfort KY's subsequent conduct indicated that they believed themselves to be bound by this agreement. (*See, e.g.*, Pl.'s Mot. TRO & Prelim. Inj. Ex. 2, DN 36-2). Defendants do not contest the existence of Martin's agreement. Thus, Comfort KY will likely be able to prove that it has contracts with Martin and Young.

Defendants, however, argue that these contracts are unenforceable. In determining enforceability of non-competition agreements, Kentucky courts look to the reasonableness of the agreement. *AWP*, 2022 WL 989133, at *7. "To determine reasonableness and consistency with public policy, Kentucky courts consider the scope of a company's business and whether the restrictive covenant is tailored to the company's interest in protecting its information and customer base." *Material Handling Sys., Inc. v. Cabrera*, 572 F. Supp. 3d 375, 391 (W.D. Ky. 2021) (citing *Crowell v. Woodruff*, 245 S.W.2d 447, 449 (Ky. 1951)). Specifically, "courts consider: (a) the 'nature of the business or profession and employment,' including the character of the service that is performed by the particular employee; (b) the duration of the restriction; and (c) the scope and/or territorial extent of the restriction." *Fruit of the Loom, Inc. v. Zumwalt*, No. 1:15CV-131-JHM, 2015 WL 7779524, at *4 (W.D. Ky. Dec. 2, 2015) (citing *ISCO Indus., Inc. v. Shugart*, No. 3:14-CV-00249-TBR, 2014 WL 2218116, at *3 (W.D. Ky. May 28, 2014)). In general, "[t]he factors applied by Kentucky courts for determining whether a covenant is reasonable are very broad, allowing a good deal of discretion to the district court in making its analysis." *Lantech.com v. Yarbrough*, 247 F. App'x 769, 774 (6th Cir. 2007) (quoting *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994)).

Young was a Comfort KY executive, and his non-competition provision prohibits him from competing for two years "within two hundred (200) miles of where the Company conducts

business." (Young Agreement 4). The agreement does not define "where the Company conducts business," but Robinson testified that Comfort KY only intends to enforce an area within 200 miles from Bowling Green, Kentucky. (Prelim. Inj. Hr'g; Unofficial Tr. 106:1-107:6).

Defendants argue that this geographic scope is unreasonable. "Many courts look to the type of business involved (whether it operates globally, nationally, or just regionally) to determine if a broad geographic scope is reasonable. If the employer operates nationally or in some foreign countries, courts will typically find a broad non-compete reasonable." *FBK Partners, Inc. v. Thomas*, No. 6:09-CV-292-GFVT, 2010 WL 4867638, at *5 (E.D. Ky. Nov. 23, 2010) (citation omitted); *see Material Handling Sys.*, 572 F. Supp. 3d at 391 ("Courts applying Kentucky law have repeatedly enforced two-year nationwide noncompete clauses."). "Other courts seem to focus more on where the employee actually conducted business, including where the customers with whom the employee had contact were located." *FBK Partners*, 2010 WL 4867638, at *5 (citations omitted).

Unlike in *AWP*, where the defendants showed that they did not work in the geographic area, the evidence reflects that Young worked with customers in Bowling Green, although it has not been shown that he performed any significant work outside of Bowling Green. *AWP*, 2022 WL 989133, at *8. Robison testified that Comfort KY has done work throughout Kentucky, as well as in Indiana, Tennessee, and even Texas. (Prelim. Inj. Hr'g; Unofficial Tr. 49:12-23). Thus, it is unclear to what extent this 200-mile restriction is reasonable as to Young. *Material Handling Sys.*, 572 F. Supp. 3d at 392 ("Limiting future employment options is precisely the point of a noncompete agreement, which Kentucky law and Kentucky courts regularly enforce when tailored in scope and duration . . . ." (citation omitted)).

Turning to Martin, a former Comfort KY sales representative, his agreement prohibits him from soliciting or competing for Comfort USA's customers for eighteen months "in the geographical area in which the Company maintains offices, sales agents, or otherwise conducts business," with "the Company" defined as Comfort USA, which is a national company. (Martin Agreement 2-3). In a previous case, "[t]his Court recognized that, while the agreement had no geographical limitations, its limited scope applying only to sales and solicitations to current or former customers 'saved' it from being potentially unenforceable." *ISCO Indus.*, 2014 WL 2218116, at *3 (citing *Snider Bolt & Screw, Inc. v. Quality Screw & Nut*, No. 3:05-CV-738-H, 2010 WL1032799, at *5 (W.D. Ky. Mar. 17, 2010)). Although Martin's agreement has potentially nationwide impact, it is limited to Comfort USA's customers, which likely makes it reasonable.

Next, Comfort KY must show that Young and Martin likely breached these agreements. Young's agreement provides that he "shall not directly or indirectly own, manage, operate, *participate in* or finance *any business venture that competes*" with Comfort KY. (Young Agreement 4 (emphasis added)). "Participate" is not defined by the agreement. When terms are not defined within a contract, Kentucky courts "give the terms their ordinary meaning as persons with the ordinary and usual understanding would construe them." *Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 560 F. Supp. 3d 1049, 1056 (W.D. Ky. 2021) (citation omitted). "Participate" means "to take part" or "to have a part or share in something." *Participate*, Merriam Webster, https://www.merriam-webster.com/dictionary/participate [https://perma.cc/CA9U-YCQ2] (last visited Aug. 13, 2026).

Defendants argue that Young is not prohibited from being employed by a competitor. (Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. 26). "While Young did not have an ownership

interest in Young's Mechanical, his non-competition provision was a 'material condition' of Comfort USA's purchase of Young's Mechanical. The non-competition provision would, therefore, prohibit Young from turning around and starting a new version of Young's Mechanical after Comfort USA's acquisition of it." (Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. 26 (citation omitted)). That is without question. Young's agreement, however, also prohibits him from "participat[ing] in" any competing business venture, and participation is a broad enough term to encompass employment. Even under Defendants' proposed definition, AHM is still a business venture, with which Young is prohibited from participating, and AHM clearly competes with Comfort KY. (*See* Defs.' Resp. Pl.'s Mot. TRO & Prelim. Inj. 26). Thus, Comfort KY is likely to succeed on its breach of contract claim against Young.

Martin's agreement provides that he may not "solicit business from, or compete with the Company for the business of any customer of the Company. . . . A customer is defined as a client who Comfort Systems USA has done business with or has had in the past two years . . . ." (Martin Agreement 3). Defendants argue that Martin did not solicit any customers. *Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1053 (E.D. Ky. 1994) ("[M]ere informational contact between the Wells and any former client does not constitute a 'solicitation' under the employment agreements. An informational contact would consist of any written or oral contact that provides information about the Plaintiffs' whereabouts and how they may be contacted."); *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 12 (1st Cir. 2013) ("[T]he identity of the party making initial contact is just one factor among many that the trial court should consider in drawing the line between solicitation and acceptance in a given case."). Even if this is true, Martin is also prohibited from *competing* with Comfort KY for the business of its customers. Yet, Martin sold services to the City of Bowling Green and Amcor/Berry Global, for example, to

both of which Comfort KY had recently provided service. (Pl.'s Reply Mot. TRO & Prelim. Inj. Ex. 6, DN 36-6; Pl.'s Reply Mot. TRO & Prelim. Inj. Ex. 8, DN 36-8; Ramsey Dep. Excerpts 15:10-11). Comfort KY is therefore likely to succeed on its claim that Martin violated his non-compete agreement, although the extent of that success is unclear given Martin's testimony that he attempted to limit his activities with AHM to seeking new customers.[1]

Turning to Comfort KY's tortious interference claim, Comfort KY has shown Martin and Young's contracts were likely breached, as discussed above, and that Defendants were aware of those contracts. (Martin Decl. ¶ 12; Unofficial Tr. 250:24-251:6). Kentucky follows the Restatement (Second) of Torts, which states:

> To be subject to liability under [tortious interference with performance of a contract], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract. But it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have.

Restatement (Second) of Torts § 766 (1979); *Outfront Media, LLC v. LeMaster*, 399 F. Supp. 3d 671, 690 (E.D. Ky. 2019); *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 925 (S.D. Ohio 2017) ("This testimony from Lang, taken in a light most favorable to Horter, suggests that Borer/PCM knew about the Restrictive Covenants and intended to structure the new RIA in such a way as to avoid triggering their non-competition prohibitions. If an alleged wrongdoer knows of the contract, he is subject to liability even though he is mistaken as to [the facts'] legal

[1] Young and Martin are also prohibited from soliciting Comfort KY's employees, but Comfort KY has not provided the Court with evidence to support a likelihood of success on its claim that these provisions were breached. (*See* Prelim. Inj. Hr'g).

significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have." (internal quotation marks omitted) (citation omitted)). Given that AHM took efforts to limit both Young's and Martin's work activities, it is unclear to what extent Comfort KY's tortious interference claim against AHM will be successful.

**b. Confidentiality and Nondisclosure Provisions**

Young and Martin's employment agreements both contain confidentiality provisions. Comfort KY alleges that Young breached his agreement by removing totes from his office, which allegedly contain Comfort KY's business records. (Pl.'s Mot. TRO & Prelim. Inj. 30). Robinson testified that Young's office no longer contained any files, but he did not know what was in the totes and whether any specific files were missing. (Prelim. Inj. Hr'g; Unofficial Tr. 128:22-129:15). Young testified that the totes contained his personal property. (Prelim. Inj. Hr'g; Unofficial Tr. 173:11-24). This is not enough to show that Young likely misappropriated any confidential information. Additionally, while Comfort KY has shown that Martin likely violated his non-competition provision, it has not shown that he likely misused confidential information to do so. (Pl.'s Mot. TRO & Prelim. Inj. 31; Prelim. Inj. Hr'g). Accordingly, Comfort KY is unlikely to succeed on its claims related to the confidentiality provisions.

**c. Claims Against Ramsey**

Moving on to Ramsey, Comfort KY moves for an injunction as to its claims for conversion, trespass to chattels, and breach of the duty of loyalty. (Pl.'s Mot. TRO & Prelim. Inj. 31-32). The basis for the conversion and trespass claims against Ramsey is Comfort KY's contention that he removed proprietary files from Comfort KY's Bowling Green office. (Pl.'s Mot. TRO & Prelim. Inj. 32-33). Success on these claims appears unlikely because Comfort KY

cannot identify what, if any, files are missing, as Robinson only testified employees were unable to find specific files. (Prelim. Inj. Hr'g; Unofficial Tr. 130:21-131:5).

Comfort KY has also not shown that it is likely to succeed on its claim for breach of duty of loyalty. First, it is unclear whether the complaint asserts a claim against Ramsey for the breach of a fiduciary duty. (*Compare* Compl. ¶¶ 117-122, *with* Compl. ¶¶ 123-128). If the complaint does not assert such a claim, Comfort KY would not be likely to succeed because it has not demonstrated that there is an independent cause of action for a non-fiduciary employee's breach of the duty of loyalty. *See WCP/Fern Exposition Servs., LLC v. Hall*, No. 3:08-CV-522, 2011 WL 1157699, at *8 (W.D. Ky. Mar. 28, 2011) ("Because Fern has not shown that there exists a cause of action between an employer and a non-fiduciary employee with respect to loyalty, diligence, good faith, or obedience, Hall's motion for summary judgment on this count will be granted.").

Even if the complaint does assert that Ramsey breached a fiduciary duty, it is not clear whether he owes Comfort KY any fiduciary duty. "A fiduciary duty may arise from an employer-employee relationship, although whether this is the case for [employees] who are not corporate officers or directors depends on the 'specific circumstances' of the employment." *WCP/Fern*, 2011 WL 1157699, at *4 (internal citation omitted) (quoting *Miles Farm Supply, LLC v. Helena Chem. Co.*, No. 4:06-CV-23, 2008 WL 3010064, at *7 (W.D. Ky. Aug. 1, 2008)). "Kentucky courts are willing to find a fiduciary relationship between an employer and employee when the employee has a 'position of trust, the freedom of decision[,] and access to confidential corporate information.'" *Cmty. Ties of Am., Inc. v. NDT Care Servs., LLC*, No. 3:12-CV-00429-CRS, 2015 WL 520960, at *7 (W.D. Ky. Feb. 9, 2015) (citations omitted). Robinson testified

that Ramsey was in a "management-type position" and had access to Comfort KY's customer relationship management system. (Prelim. Inj. Hr'g; Unofficial Tr. 63:2-22).[2]

If Ramsey did owe Comfort KY a duty of loyalty, sending a quote on behalf of AHM to a Comfort KY customer on February 23, 2026, while he was still within his two-week notice period and an employee of Comfort KY, would likely be a violation of that duty. (Prelim. Inj. Hr'g Pl.'s Ex. 19; Prelim. Inj. Hr'g Pl.'s Ex. 17). Because Ramsey is no longer employed by AHM, however, this is not an ongoing, irreparable harm to be remedied by a preliminary injunction.

While Comfort KY also alleges that Ramsey is misusing confidential information he gained as a Comfort KY employee, it is has not shown that it is likely to succeed on this claim. The only specific pricing information that Robinson alleges Defendants stole is from a monthly A/C rental agreement and condenser project with Country Oven Bakery. (Prelim. Inj. Hr'g; Unofficial Tr. 122:9-17). Ramsey, however, has worked with Country Oven Bakery for over 30 years, and Country Oven Bakery sent information about the A/C rental unit to Ramsey; Country Oven Bakery was free to share pricing information with other contactors and cancel its month-to-month contract with Comfort KY for any reason. (Ramsey Decl. ¶¶ 3-4; Prelim. Inj. Hr'g; Unofficial Tr. 123:1-124:7). Comfort KY, therefore, has not shown that it is likely to succeed in its claims against Ramsey.

### 3. ***Substantial Harm to Others***

"The third factor for a court to consider is whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550-51 (6th Cir. 2007) (internal quotation marks omitted) (citation

[2] Ramsey did not testify at the preliminary injunction hearing, and although the Court granted Comfort KY permission to tender Ramsey's full deposition, it has not yet done so.

omitted)). In this case, there is no indication that a preliminary injunction would harm third parties.

### 4. *Public Interest*

"While it is true that the public has a general interest in seeing that reasonable non-compete agreements are enforced, the public also has an interest in 'allowing a successful salesman to continue performing his trade.'" *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 610 (E.D. Mich. 2015) (citations omitted). Further, a sister court called the harm to the public from not enforcing contracts "largely notional." *Cretor Constr. Equip. LLC v. Gibson*, 738 F. Supp. 3d 950, 972 (S.D. Ohio 2024). In this instance "if the Court denies the request for injunctive relief, only to later determine that it erred in doing so, the public would not suffer any meaningful harm." *Id.* Thus, courts may find that this factor is neutral in non-competition cases. *Apex*, 119 F. Supp. 3d at 610. The Court does so here.

### 5. *Balancing the Factors*

In this instance, the first two factors are the most relevant. While it is likely that Martin and Young may have breached their employment agreements and AHM potentially interfered with those contracts, Comfort KY has not acted with the diligence befitting an emergency, making a preliminary injunction inappropriate. The Court will not now prohibit Young and Martin from working at AHM when Comfort KY made no effort to seek judicial intervention for months and did not even bother to call or send a cease and desist letter when it saw the image of Young and Martin in marketing material from an obviously competing business. A preliminary injunction is an "extraordinary equitable remedy that is never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (internal quotation marks omitted) (quoting *Winter*, 555 U.S. at 24). That extraordinary remedy is not warranted here. Comfort KY's claims

will be evaluated at trial, and if Defendants engaged in conduct in breach of their contractual duties, they will be held to account for resulting damages.

**B. Plaintiff's Motion for Leave to File Excess Pages**

Comfort KY seeks leave to file its TRO and preliminary injunction motion, which exceeds the page limitation of LR 7.1(d). (Pl.'s Mot. Leave File Excess Pages 1). Because the motion is unopposed and the request is reasonable, the motion is granted.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction (DN 5) is **DENIED**, and Plaintiff's Motion for Leave to File Excess Pages (DN 26) is **GRANTED**.

**Greg N. Stivers, Judge**
**United States District Court**
August 14, 2026

cc: counsel of record